J-S71017-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE MATTER OF: L.E. A/K/A L.G.E., A MINOR | : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: N.E., MOTHER | : : : : : : | |
| | : | No. 315 EDA 2016 |

Appeal from the Order Entered December 22, 2015
In the Court of Common Pleas of Philadelphia County
Family Court at No(s):  CP-51-DP-0003116-2015

BEFORE:  BOWES, J., PANELLA, J., and FITZGERALD*, J.

MEMORANDUM BY PANELLA, J.                    **FILED OCTOBER 11, 2016**

Appellant, L.E. ("Mother"), appeals from the December 22, 2015 order

that found N.E. ("Child") (born March 2013), was not dependent, and that

Child was a victim of abuse by Mother. The order also transferred legal and

physical custody of Child to R.G. ("Father"). We affirm.

> On [September 5, 2015], Mother went to work and called
> [J.M.], the father of [Child]'s sister, to watch [Child] and his
> older sister. On [September 6, 2015], at approximately 7:30
> a.m., Mother noticed scratch marks on the top of [Child]'s hand
> and swelling of his right ear. Mother testified that [Child] had
> bruising on his face and a scratch on his forehead before she
> went to work on [September 5, 2015]. She testified that he had
> fallen on [September 3, 2015], at the park, and that he fell [on
> September 4, 2015] in the bathroom, both of which caused the
> scratches and bruising on his face. She also testified that the
> swelling in his right ear was caused when he fell tripping over

_____

* Former Justice specially assigned to the Superior Court.

the threshold at his sister's grandfather's house. Mother then stated that she believed that [Child] had an allergic reaction on the night of [September 5, 2015] that caused the swelling in his ear.

On [September 7, 2015], at approximately 12:00 a.m., Mother brought [Child] to the emergency room at Einstein Medical Center. When Mother brought [Child] to the hospital, she told hospital staff that when [Child] woke up, his ear was swollen and appeared to enlarge throughout the day, and that he may have sustained the bruises and abrasions from roughhousing with his siblings and the children at his daycare.

Later, on [September 7, 2015], [Child] was transferred to St. Christopher's Hospital for Children. Dr. Maria McColgan, the director of the child protection program at St. Christopher's, was consulted by the medical team caring for [Child] because of concern of physical abuses. Dr. McColgan observed that [Child] had severe swelling and bruising of his right ear, bruising on his left ear, bruising and abrasions on his face, bruising on his back and side, and somewhat deep abrasions on the back of his right hand. The hospital found that [Child] did not have an infection that would cause the swelling in his ear, nor did he have a bleeding disorder that would cause abnormal bleeding tendencies. Dr. McColgan determined that the nature of the injuries could not have been caused by [Child] merely falling on the pavement. She found that it is not likely that a [two] year old child would sustain those injuries without some sort of non-accidental trauma, and determined to a reasonable degree of medical certainty that [Child]'s injuries were caused by child abuse.

On [September 8, 2015], [Child] was discharged from the hospital to the care of his maternal aunt, [W.S.]. On the same day, the Philadelphia Department of Human Services ("DHS") social worker Magdalene Bey visited the family's home. Mother told Ms. Bey that [Child] had fallen on the playground, and in the bathroom. Additionally, Mother stated that [Child] was jumping on the bed and hit his head on a radiator cover, and that he was roughhousing with siblings and at daycare. Initially, Mother told Ms. Bey that on the night of [September 5, 2015], her sister, [K.E.] was watching [Child], and [K.E.] corroborated her story. After the safety conference, [K.E.] recanted her statement, and admitted that she had not watched [Child] that night, but rather

- 2 -

… [J.M.] had. [K.E.] stated that she had lied because [J.M.] had a criminal record. She thought DHS was trying to take [Child] from Mother, and it would look bad that [Child] was watched by [J.M.].

Ms. Bey stated that she did not have drug, alcohol, or mental health concerns about Mother, but was concerned about [J.M.], who had posted several photos to Facebook of himself with marijuana and alcohol. Mother stated that [J.M.] did not live in the home, but Ms. Bey observed a conversation between Mother and her maternal grandmother that led her to believe that [J.M.] had been living in the home. Additionally, Ms. Bey stated that she had no concerns for Father, and his home is appropriate for [Child].

Trial Court Opinion, filed 3/22/16, 1-4 (citations and footnotes omitted).

On December 1, 2015, DHS filed a dependency petition recommending that Child be committed to DHS. The trial court held a hearing on the dependency petition. Following the hearing, the trial court found that Child was not dependent, but Child was a victim of abuse by Mother and J.M. The trial court also transferred legal and physical custody of Child to Father.

Mother filed a timely notice of appeal along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). On appeal, Mother raises the following issues:

1. [Whether t]he trial court erred in finding child abuse as to Mother[?]

2. [Whether t]he trial court erred in disposing of this case by awarding custody of [Child] to [Father?]

Mother Brief, at i.

We note that Mother does not dispute the trial court's reliance on the best interest factors set forth in the Child Custody Act, 23 Pa.C.S.A.

§ 5328(a), in awarding legal and physical custody to Father. In fact, she states that the court's reliance on the Child Custody Act was proper. **See** Mother's Brief, at 8. Rather, Mother questions the weight that the trial court gave to its finding that she perpetrated the abuse, which she alleges was an erroneous finding. **See id**. Mother also contends that the trial erroneously considered J.M.'s suspected drug use, and erroneously considered J.M.'s abuse of Child by including J.M. as a member of Mother's household. **See id**. at 8-9.

After a careful review of the record, including the notes of testimony, the applicable law, and the arguments of the parties, we conclude that the thorough opinion of the Honorable Glynnis D. Hill, filed on March 22, 2016 pursuant to Pa.R.A.P. 1925(a), addresses the issues raised by Mother, and supports the reasons for the trial court's decision. That decision found Child not dependent, but found that Child was the victim of abuse by Mother and J.M., and transferred legal and physical custody of Child to Father. Accordingly, we adopt the March 22, 2016 opinion of the trial court as our own. **See** Trial Court Opinion, filed 3/22/16.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/11/2016

# IN THE COURT OF COMMON PLEAS
# FOR THE COUNTY OF PHILADELPHIA

| | | |
|---|---|---|
| In the Matter of: L.E., a Minor | : | FAMILY COURT DIVISION |
| | : | |
| | : | CP-51-DP-0003116-2015 |
| | : | |
| Appeal of: N.E., Mother | : | No. 315 EDA 2016 |

## OPINION

On 12/1/2015, the City of Philadelphia Department of Human Services (DHS) filed a petition recommending that L.E. (Child) be committed to DHS. In its petition, DHS alleged that the Child was dependant and/or abused pursuant to the Juvenile Act (42 Pa.C.S. § 6302) and/or the Child Protective Services Law (23 Pa.C.S. § 6303(b)(1)), respectively. The pre-hearing conference was scheduled for 12/8/2015. On 12/8/2015, the hearing was continued to 12/22/2015 because the court was awaiting doctor testimony. On 12/22/2015, the court found that the Child was not dependent, and the Child was a victim of child abuse by Nasheeda Ellis (Mother) and Jamal McQueen (Father of Sibling). The court also transferred legal and physical custody of the Child to Robert Gordon (Father). On 1/20/2016, Mother filed a timely notice of appeal along with a concise Statement of Matters Complained of on Appeal pursuant to Pa.R.A.P. 1925(a)(2)(i), raising the following issues:

1. The Court erred in finding child abuse as to mother, N.E.
2. The Court erred in disposing of the petition by awarding custody to L.E.'s father.

## FACTS

On 9/5/2015, Mother went to work and called Jamal McQueen, the father of L.E.'s sister, to watch L.E. and his older sister.[1] On 9/6/2015, at approximately 7:30 a.m., Mother noticed scratch marks on the top of L.E.'s hand and swelling of his right ear.[2] Mother testified that L.E.

---

[1] Notes of Testimony, 12/22/2015, pg 51-52, 75.
[2] N.T., 12/22/2015, pg. 70.

1

had bruising on his face and a scratch on his forehead before she went to work on 9/5/2015.[3] She testified that he had fallen on Thursday, 9/3/2015, at the park, and that he fell Friday, 9/4/2015, in the bathroom, both of which caused the scratches and bruising on his face.[4] She also testified that the swelling in his right ear was caused when he fell tripping over the threshold at his sister's grandfather's house. Mother then stated that she believed that L.E. had an allergic reaction on the night of 9/5/2015 that caused the swelling in his ear.[5]

On 9/7/2015, at approximately 12:00 a.m., Mother brought L.E. to the emergency room at Einstein Medical Center.[6] When Mother brought L.E. to the hospital, she told hospital staff that when L.E. woke up, his ear was swollen and appeared to enlarge throughout the day, and that he may have sustained the bruises and abrasions from roughhousing with his siblings and the children at his daycare.[7]

Later on 9/7/2015, L.E. was transferred to St. Christopher's Hospital for Children. Dr. Maria McColgan, the director of the child protection program at St. Christopher's, was consulted by the medical team caring for L.E. because of concern of physical abuse.[8] Dr. McColgan observed that L.E. had severe swelling and bruising of his right ear, bruising on his left ear, bruising and abrasions on his face, bruising on his back and side, and somewhat deep abrasions on the back of his right hand.[9] The hospital found that L.E. did not have an infection that would cause the swelling in his ear, nor did he have a bleeding disorder that would cause abnormal bleeding tendencies.[10] Dr. McColgan determined that the nature of the injuries could not have

---

[3] N.T., 12/22/2015, pg. 72.
[4] N.T., 12/22/2015, pg. 72-74.
[5] N.T., 12/22/2015, pg. 76.
[6] N.T., 12/22/2015, pg. 71.
[7] N.T., 12/22/2015, pg. 19, 50.
[8] N.T., 12/22/2015, pg. 12, 15-17.
[9] N.T., 12/22/2015, pg. 17-18. The court saw 22 photographs of L.E.'s injuries that showed obvious and disconcerting swelling, and extensive bruising. N.T., 12/22/2015, pg. 25, 43-45, 89.
[10] N.T., 12/22/2015, pg. 18, 22-23.

2

been caused by L.E. merely falling on the pavement.[11] She found that it is not likely that a 2 year old child would sustain those injuries without some sort of non-accidental trauma, and determined to a reasonable degree of medical certainty that L.E.'s injuries were caused by child abuse.[12]

On 9/8/2015, L.E. was discharged from the hospital to the care of his maternal aunt, Wykina Skinner. On the same day, DHS social worker Magdalene Bey visited the family's home.[13] Mother told Ms. Bey that L.E. had fallen on the playground, and in the bathroom.[14] Additionally, Mother stated that L.E. was jumping on the bed and hit his head on a radiator cover, and that he was roughhousing with siblings and at daycare.[15] Initially, Mother told Ms. Bey that on the night of 9/5/2015, her sister Kendra Ellis was watching L.E., and Mother's Sister corroborated her story.[16] After the safety conference, Mother's Sister recanted her statement, and admitted that she had not watched L.E. that night, but rather the Father of L.E.'s Sibling had.[17] Mother's Sister stated that she had lied because Father of Sibling had a criminal record.[18] She thought DHS was trying to take L.E. from Mother, and it would look bad that L.E. was watched by Father of Sibling.[19]

Ms. Bey stated that she did not have drug, alcohol, or mental health concerns about Mother, but was concerned about Father of Sibling, who had posted several photos to Facebook of himself with marijuana and alcohol.[20] Mother stated that Father of Sibling did not live in the home, but Ms. Bey observed a conversation between Mother and her maternal grandmother that

---

[11] N.T., 12/22/2015, pg. 23-24.
[12] N.T., 12/22/2015, pg. 28-29.
[13] N.T., 12/22/2015, pg. 48.
[14] N.T., 12/22/2015, pg. 49-50.
[15] Id.
[16] N.T., 12/22/2015, pg. 50-51.
[17] Id.
[18] Id.
[19] Id.
[20] N.T., 12/22/2015, pgs. 58-59.

3

led her to believe that Father of Sibling had been living in the home.[21] Additionally, Ms. Bey stated that she had no concerns for Father, and his home is appropriate for L.E.[22]

## DISCUSSION

The standard for review for dependency cases is whether there has been an abuse of discretion. In re R.J.T., 9 A.3d 1179, 1190 (2010). In this review, the appellate court is required to "accept the findings of fact and credibility determinations of the trial court if they are supported by the record." Id. The Superior Court "may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court." J.R.M. v. J.E.A., 33 A.3d 647, 650 (Pa.Super.2011). With this standard in mind, the court will discuss each of the Mother's contentions.

### I. The court did not err in finding child abuse as to the Mother.

For a finding of child abuse, the Juvenile Act does not require proof that the parent has committed or condoned abuse, but merely evidence that the child is without proper parental care. In re R.R., 686 A.2d 1316, 1317-18 (1996); *see also* 42 Pa.C.S. § 6302(1) (explaining that a determination of lack of parental control may be based upon evidence of conduct by the parent that places the health, safety, or welfare of the child at risk). In determining whether there exists proper care, acts and omissions of a parent must weigh equally, since parental duty includes protection of a child from the harm others may inflict. In re R.P., 957 A.2d 1205, 1211-12 (2008); *citing to* In re R.W.J., 826 A.2d 10 (Pa.Super. 2003).

Child Abuse includes " any recent act or failure to act...[which causes] nonaccidental serious physical injuries...[or] any recent act, failure to act or series of such acts or failures to

---

[21] N.T., 12/22/2015, pg. 63. Mother had told her maternal grandmother that she had put Father of Sibling out of the home. Id.

[22] N.T., 12/22/2015, pg. 54.

4

act…which creates an imminent risk of serious physical injury [or] serious physical neglect…which endangers a child's life or development or impairs the child's functioning." 23 Pa.C.S. § 6303(b)(1)(i),(iii), (iv). Serious physical injury is any injury that causes "severe pain" or "significantly impairs" the child's ability to function physically. Id. at 6303(a); *see also* In re L.Z., 111 A.3d 1164, 1174 (2015).

In this case, L.E. presented at the hospital with severe bruising and abrasions. He appeared to be in pain, and the bruising was still swollen, indicating that it was recently formed. Ms. Bey stated that she was not sure whether Mother had caused the injuries.[23] However, even if Mother did not inflict the wounds herself, child abuse only requires evidence that the child is without proper care. This includes creating an imminent risk of serious physical injury which impairs the child's functioning. Dr. McColgan found to a reasonable degree of medical certainty that L.E.'s injuries were caused by child abuse. The injuries occurred because Mother did not properly care for L.E., and left him in a situation where there was imminent risk of serious physical injury. L.E.'s swollen ear did not present until the morning after Mother left him in the care of Father of Sibling, and he had numerous other bruises and abrasions all over his body. Mother knew that Father of Sibling had previously been incarcerated, which had led her, her sister, and Father of Sibling to lie to DHS at the outset of the investigation.[24]

Additionally, Ms. Bey did not have confidence that Mother would be able to provide a safe place for L.E. Based on Mother's conversation, it was not clear whether Father of Sibling was out of the house, but in light of Mother's non-forthrightness with Ms. Bey about whether he lived in the household, the court was concerned about Mother putting L.E. at further risk.[25]

---

[23] N.T., 12/22/2015, pg. 64-65.
[24] N.T., 12/22/2-15, pg. 76-78.
[25] On 9/8/2015, Mother told Ms. Bey that Father of Sibling did not live in the home, but based on the conversation Ms. Bey overheard, there was an implication that Mother did not put him out until after DHS investigated. N.T.,

5

Although there is no evidence that Mother directly caused the injuries, she did not properly care for L.E. because she placed his health, safety, and welfare at risk. Therefore, the court did not err in finding child abuse as to Mother.

## II. The court did not err in disposing of the petition by awarding custody to the Child's Father.

In a child custody case, the primary concern is the best interests of the child. J.R.M., 33 A.3d at 652. To determine the best interests of a child when entering a custody order, the court must consider all of the factors in 23 Pa.C.S.A. § 5328(a). E.D. v. M.P., 33 A.3d 73, 80–81, n. 2 (Pa.Super.2011). These factors include:

> (1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.
> (2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.
> (2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).
> (3) The parental duties performed by each party on behalf of the child.
> (4) The need for stability and continuity in the child's education, family life and community life.
> (5) The availability of extended family.
> (6) The child's sibling relationships.
> (7) The well-reasoned preference of the child, based on the child's maturity and judgment.
> (8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.
> (9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.
> (10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.
> (11) The proximity of the residences of the parties.
> (12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.
> (13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.
> (14) The history of drug or alcohol abuse of a party or member of a party's household.
> (15) The mental and physical condition of a party or member of a party's household.

---

12/22/2015, pg. 63. The testimony suggests that Mother did not feel a sense of urgency to protect L.E. from Father of Sibling until DHS investigated the abuse.

6

(16) Any other relevant factor.

The first factor does not appear to favor either Mother or Father. They shared custody, and there was no indication that either one would be more likely to encourage and permit frequent and continuing contact with the other party. They both appeared to have encouraged contact with the other.

The second factor weighs heavily in favor of Father. Ms. Bey indicated that she did not have any concerns about Father's house, and his home is appropriate for L.E. to live in. L.E. suffered child abuse at the hands of Mother and Father of Sibling while at Mother's home. There was an investigation in Philadelphia for the abuse suffered on 9/5/2015, and Mother and Father of Sibling were identified as the perpetrators. Father of Sibling reportedly has a good relationship with his own child, and would therefore most likely continue to be at the home. There would be a continued risk of harm to L.E. at Mother's house.

The third factor does not appear to weigh in favor of either Mother or Father. Ms. Bey stated that she was not concerned about drug, alcohol, or mental health problems for either one, and they appear to have shared responsibilities for L.E.

Similarly, the fourth factor does not appear to weigh strongly in favor of either party. Awarding sole custody to father may disrupt continuity in the child's education, family life, and community life. L.E. saw his siblings at his Mother's house, and changing his residence would alter his community. However, there is no evidence of whether L.E.'s education will be affected.

Under the fifth factor, there is no evidence that L.E.'s extended family would become unavailable. L.E. still has supervised visitation with Mother, and could continue to see his extended family on Mother's side.

7

Similarly, the sixth factor weighs slightly in favor of Mother. L.E. will not be able to spend as much time with his siblings if he is prevented from living with Mother part time, but he will still be able to visit with them.

The seventh factor is not applicable. L.E. is approximately 2 ½ years old, and may not be able to form a preference for living with either parent.

There is no evidence that the eighth factor weighs in favor of either parent. It does not appear as though either parent attempts to turn the child against the other.

Similarly, the ninth factor does not weight in favor of one party over the other. Both parties maintain a loving, stable, consistent and nurturing relationship with the child.

The tenth factor does not weigh in favor of either party. The DHS social worker did not have concerns about either parent meeting the daily physical, emotional, developmental, or educational needs of the child.

No evidence was given about the proximity of the residences of the parties. However, neither party is moving, and during shared custody the parties lived close enough that they could exchange custody. The eleventh factor, therefore, does not weigh in favor of either Mother or Father.

The twelfth factor also weighs heavily in favor of Father. Although mother is generally available to care for the child, she was unable in this instance to care for L.E., or to make appropriate child care arrangements. While she was at work, she asked Father of Sibling to watch L.E., subjecting him to child abuse. There are also indications that similar situations may occur in the future.

The thirteenth factor does not appear to weigh in favor of either Father or Mother. There is no evidence that the parties are unwilling to cooperate with one another.

The fourteenth factor also weighs in favor of Father. Although Mother claims that Father of Sibling does not live in her home, Ms. Bey observed that it is most likely that he did. Ms. Bey found pictures on Facebook of Father of Sibling drinking and smoking marijuana. Having a member of Mother's household that abuses illegal narcotics is not in the best interest of the child.

The fifteenth factor, however, does not weigh in favor of either party. Ms. Bey did not have concerns about the mental or physical conditions of either party.

After carefully considering all factors under 23 Pa.C.S.A. § 5328(a), this court concludes that overall they are weighed in favor of granting Father custody. Mother and Father appear to be cooperative in caring for L.E., but Mother has not provided a safe home environment for him, and subjected him to child abuse. There was insufficient evidence in the record that the mother was willing to take steps to remove the threat of abuse (i.e., the sibling's father) to L.E. Therefore, the court did not err in awarding custody to Father. The court concluded that it would be in the best interests of L.E. to be in Father's custody to avoid further abuse.

## CONCLUSION

The court did not err in either finding child abuse as to Mother, or awarding custody to Father. The standard of review is whether the trial court abused its discretion. The conclusions must be unreasonable in light of the findings of the trial court. This court found that Mother committed child abuse by leaving L.E. in imminent risk of serious physical injury, based on testimony from Dr. McColgan, the director of the Child Protection Program at St. Christopher's Hospital, and testimony from Ms. Bey, the DHS social worker assigned to the investigation. Both witnesses concluded that L.E.'s injuries were the result of child abuse, and that Father's home is more appropriate for L.E. to live in. Therefore, based on the evidence, the court did not abuse its discretion.

By the Court,

Glynnis D. Hill, Judge

10

## IN THE COURT OF COMMON PLEAS
## FOR THE COUNTY OF PHILADELPHIA

In the Matter of: L.E., a Minor       :       **FAMILY COURT DIVISION**

                           :

                           :       **CP-51-DP-0003116-2015**

                           :

Appeal of: N.E., Mother        :       **No. 315 EDA 2016**

## PROOF OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been served upon the following persons on the 22nd day of March, 2016.

Scott Gessner, Esquire
100 S. Broad St., Ste. 1419
Philadelphia, PA 19110

Rachel Hantgan, Esquire
Assistant City Solicitor
Child Welfare Unit
1515 Arch Street
Philadelphia, PA 19102

Cara Fagan
530 Walnut St., Ste. 315
Philadelphia, PA 19106

Melanie Katz Silverstein, Esquire
1515 Market St., Ste. 1200
Philadelphia, PA 19102

Patricia Cochran, Esquire
1800 JFK Blvd., Ste. 300
Philadelphia, PA 19103

_____
**DATE**

_____
**HONORABLE GLYNNIS D. HILL**

11